STATE OF MINNESOTA v. PETER J. BORGSTROM.[1]

November 2, 1897.

Nos. 10,845—(29).

District Attorney—Appointment of Attorney in His Place.

G. S. 1894, § 813, provides "that the several judges of the district courts in this state may, by order to be duly entered on the minutes, at any term of the court appoint any attorney of the court to act as, or in place of, or to assist the county attorney in any business or proceeding before the grand jury or in court, whether there be a county attorney present at such term or not." Held, that where, in the prosecution and trial of a defendant charged with having committed a crime, the county attorney was pres-

[1] Reported in 72 N. W. 799, 975.

ent at the term when such trial was had, but took no part in such trial, and did not offer or attempt to do so, and did not object to another attorney acting in the prosecution and trial who was duly appointed by the court, such appointment was valid, and the prosecution by the attorney authorized by law.

### Cruel and Unusual Punishment—Fine and Imprisonment.

A register of deeds, as such officer, intentionally misappropriated $62.50, fees received by him, which, under the law, he should have paid over to the county treasurer, and, upon conviction for such offense, was sentenced to pay a fine of $500, and be confined at hard labor in the state prison for one year. Held, that such punishment was not cruel and unusual, and not within the inhibition of Const. art. 1, § 5.

### Register of Deeds—Embezzlement of Fees—Evidence.

Evidence considered, and held sufficient to justify the verdict of the jury.

Defendant was indicted and convicted in the district court for St. Louis county of the crime of misappropriating public moneys to his own use, and from a judgment, Moer, J., sentencing him to pay a fine of $500, and to be confined in the state penitentiary one year, he appealed. Affirmed.

At the trial defendant requested the court to charge as follows:

"The defendant is presumed to be innocent of the crime with which he is charged in the indictment, and this presumption of innocence attends every question and fact in the case, and remains until overcome by such evidence as convinces the jury of the defendant's guilt beyond a reasonable doubt."

"To authorize a conviction of the defendant, Borgstrom, of the crime with which he is charged in the indictment, the circumstances detailed to you in the evidence should not only be consistent with his guilt, but they should be inconsistent with any rational conclusion that he is innocent."

The court's refusal so to charge forms the basis of defendant's assignments of error 29 and 31.

*Dibell & Reynolds,* for appellant.

It is submitted that defendant's objection to Mr. Baldwin's acting as prosecuting attorney should have been sustained for the following reasons: (1) The public prosecutor is, under our system of jurisprudence, a judicial officer, acting for the public impartially,

fairly, unbiased, protecting the wrongfully accused as well as punishing the unquestionably guilty, and not serving at the instance of private persons or to accomplish their ends, but only for the public good. (2) Mr. Baldwin was not entitled to be considered in the light of such a public prosecutor, but rather as the attorney of certain interested private parties employed to convict and not to protect, and his connection with the case was an impairment of defendant's rights. State v. Russell, 83 Wis. 330; Biemel v. State, 71 Wis. 444; People v. Hendryx, 58 Mich. 319.

*H. W. Childs,* Attorney General, and *C. O. Baldwin,* acting in place of the County Attorney, for the State.

Mr. Baldwin's appointment to act in the place of the county attorney was made under and pursuant to G. S. 1894, § 813, and was a matter resting in the sound discretion of the district judges.

BUCK, J.

On February 6, 1897, the defendant, Peter J. Borgstrom, was indicted by the grand jury of St. Louis county, charged with having committed the crime of misappropriating money received by him as register of deeds of said county. The amount so appropriated by him was alleged to be the sum of $63.25, which he had received as such register for making and certifying that certain copies of instruments were true copies thereof, as recorded in said office of register of deeds. Upon trial the defendant was found guilty, and sentenced to pay a fine of $500, and be confined in the state penitentiary at hard labor for the term of one year. From this judgment Borgstrom appeals to this court.

At the time of the finding of this indictment and trial of this action, the county of St. Louis had a duly elected and acting county attorney; but, for some reasons which do not appear in the record, he did not appear or in any way participate in the prosecution of the defendant either before the grand jury or subsequently on the trial of the action, although he was actually present in the court during the trial of the defendant upon the charge set forth in the indictment. On January 25, 1897, three of the district judges of St. Louis county made an order in these words:

"State of Minnesota,    District Court,
"County of St. Louis.    Eleventh Judicial District.

"It is hereby ordered that C. O. Baldwin, an attorney of this court, be, and he hereby is, appointed by the judges of the above-named court to act in the place of Geo. E. Arbury, county attorney of said court, in attendance upon the grand jury of said county at the present term of said court, in the investigation of wrongful acts of any officials of the county of St. Louis or the city of Duluth in said county, and in the trial of any indictment or indictments which shall be found by said grand jury as the result of such investigation.

"Dated January 25th, 1897.    J. D. Ensign,
              "W. A. Cant,
              "S. H. Moer,
          "Judges of said Court."

Subsequently on March 22, 1897, one of the three judges made a further order appointing said Baldwin to act in the place of the county attorney upon the trial of defendant under the indictment against defendant; and Baldwin acted accordingly, the county attorney taking no part in the trial. Objections were duly made by defendant to Baldwin's acting as county attorney and overruled by the trial court, and this ruling is assigned as error.

It is contended by defendant that the county attorney was neither absent nor disabled, but was present in court at the term at which the indictment was found and on the trial of the action, but was never consulted about, or had anything to do with the prosecution of, the case. The record sustains this contention; but it is silent as to whether Baldwin was ever requested to prosecute the action or assist the county attorney in the prosecution thereof. We assume that no such request was ever made, and it is a matter of regret that the grounds or reasons for the appointment of Mr. Baldwin to act in the place and stead of the county attorney in the prosecution of this case do not appear in the record. If sufficient grounds had appeared affirmatively, the authority for such appointment would unquestionably be found in G. S. 1894, § 813, which reads as follows:

"That the several judges of the district courts in this state may, by order to be duly entered on the minutes, at any term of the court appoint any attorney of the court to act as, or in place of, or to assist

the county attorney in any business or proceeding before the grand jury or in court, whether there be a county attorney present at such term or not; and the person so appointed shall take the usual oath of office, and shall thereupon be fully authorized to be present before the grand jury at any time when the county attorney might by law be present before that body: provided, that no compensation shall be paid by the county to such person so appointed by the court to assist the county attorney, when that officer is present at the term when such appointment is made, except the same be paid with the consent of the county attorney and be deducted from the regular salary of that officer."

The record then presents the question whether the trial court could legally appoint Baldwin to act as or in place of the county attorney, in the absence of any showing that he was absent, unable to act, or in any manner disqualified to act as such county attorney. It may be contended with some reason that the appointment arbitrarily by the court of an attorney to act in the place of the county attorney, and thus displace him, without apparent cause or reason, does injustice to a public officer whose sworn duty it is to act for the public welfare as well as to protect the innocent and wrongfully accused. There are but few more important offices in the state than that of county attorney, requiring, as it does, learning, ability and a high degree of personal integrity. Nor should his rights as county attorney be unjustly ignored. A county attorney is presumed to be ready and willing to perform his official duties, but as against this presumption in this case, or for some good reason, stands the order of the district judges appointing Mr. Baldwin, not to conduct or prosecute cases generally, but for the investigation of certain unlawful acts of any of the officials of St. Louis county, and act as such attorney in the trial of any indictments which shall be found by said grand jury as the result of such investigation. Although the county attorney was present at the term of court when the indictment was found and trial thereon had, it does not appear that he offered to prosecute the case in any manner, either alone or with assistance of another attorney; nor did he object to the appointment by the court of Mr. Baldwin to act in his place as county attorney, and hence he must be deemed to have acquiesced in such appointment.

Under the express provisions of the statute and the nonaction of the county attorney in the premises, we are of the opinion that the

district court was fully warranted in its appointment of Mr. Baldwin. The presumption is in this case that it had sufficient ground and good cause for making such appointment, and, in doing so, it only exercised a proper and lawful discretion in the administration of justice. A public offense appears to have been committed by one, if not more, of the county officials; and his remaining passive, instead of being active, in the prosecution of these wrongdoers, authorized the inference that the public welfare demanded the appointment of another attorney to act in the place of the county attorney. It does not rest with the defendant in a criminal trial to select a prosecuting attorney. That responsibility belongs to those who must see that the laws are duly enforced. A proper regard for the law and the position which the county attorney occupied required him to offer to prosecute this case, or state the reasons for not doing so, or object to others taking his place, if there were good grounds for so doing; but some undisclosed reasons caused him to remain silent when he should have spoken, and we are of the opinion that the public welfare demanded that the trial court do just what it did in appointing Mr. Baldwin as such attorney.

It is also assigned as error that the court erred in admitting in evidence an account book designated in the record as "Exhibit 101," claiming that such book was the personal account book of the defendant, and in no sense a public record. One of the grounds urged against its admission is that it was a flagrant and high-handed transgression of defendant's constitutional rights, as guarantied by both the federal [2] and state [3] constitutions, providing that no person shall be compelled in any criminal case to be a witness against himself, and that the right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated.

We are relieved from entering into a discussion of the rights of the defendant arising under these constitutional provisions by the conduct and admissions of the defendant himself, and by the other facts in the record. The defendant's counsel, upon the argument of this case in this court, made the broad statement that the defendant had

[2] Amend. arts. 4, 5.  [3] Art. 1, §§ 7, 10.

69 M.—33

admitted all that the books showed, and in their brief they say: "Exhibit 101 was the evidence of the state, and was not contradicted or denied by any one, but was fully corroborated by defendant;" and that "Exhibit 101 was handed by defendant to his deputy, to take before the January grand jury at the time this indictment was found."

It is true that on the trial the defendant objected to its introduction, upon the ground that it was not a public record or a record of the office of the register of deeds, but a private book of the defendant, and upon the ground that it was incompetent, irrelevant, and immaterial. That it was competent, relevant, and material is quite apparent.

The register of deeds of St. Louis county is required by law to file with the county auditor a detailed statement of the business done and fees received. Sp. Laws 1891, c. 449. His salary is $3,000 per annum in full compensation for his services rendered in his official capacity. All fees received by said register are required to be paid over to the county treasurer. The charge in the indictment against defendant is that he, as such register of deeds, did not pay over to the treasurer a certain amount of such fees, but unlawfully appropriated them to his own use. Such fees were for making and certifying copies of instruments in his office, and authorized by G. S. 1894, § 5567.

Now Exhibit 101 showed the amount so received for fees authorized by law. It was the only record book or account which showed it. It was kept by the register himself, and by him voluntarily handed to his deputy to take before the grand jury at the time this indictment was found. It contained an itemized and detailed statement of the official fees received by the register, and the character of instruments for which they were so received. It was just such a statement of fees received as he could have verified and filed with the county auditor so far as it concerned such fees. It was kept in the register's office, where the deputy register could have official access to it and any other person could see it, the same as any other book in the office. There was no wrongful seizure of the book containing Exhibit 101. On the trial, in the presence of the court, jury, defendant and his counsel, the prosecuting attorney requested the

witness Loe (then deputy register of deeds) to go to the register's office and bring the book into court, which he did, without objections from the defendant. As we have previously stated, defendant had already voluntarily handed the book to the deputy to take before the grand jury to be used in the investigation of this very charge, and at no time did he object to the prosecution having possession of the book, or claim that such possession was wrongful, or that there was any wrongful seizure thereof. The objection was not based upon any wrongful, surreptitious, or forcible seizure of the book, but that it was a private book or memoranda. Having peaceable possession of the book, the prosecution had a right to offer the same in evidence, as against the objection made.

But there was no controversy about the facts stated in the book, either on the trial or on the argument. Defendant admitted their truthfulness, so testified, and attempted to justify his act under the law by retaining the fees mentioned therein. It was not the facts that were in dispute, but the intention of the defendant, and the application of the law to the admitted and undisputed facts. There was no reversible error in the admission of the book Exhibit 101.

The facts, then, standing proven and admitted that defendant did receive and appropriate to his own use fees received by him as register of deeds for making and certifying copies of instruments in his office, could such offense be condoned by his alleged belief that he did not thereby intend to violate the statute? The court charged the jury upon this point as follows:

"The court instructs you that he had no right to make those payments in law; but, if you believe from all the evidence that he believed at the time that he made them that he did have the right to do so,—did it without any felonious intent in his mind to appropriate willfully the money of the county to his own use or that of another,—then he is not guilty."

This charge was, indeed, favorable to the defendant. The general rule is that each person is presumed to know the law, and govern himself accordingly. Government can only be carried on by officers, and it is essential to the due administration of justice and the perpetuity of government itself that its officers are not guilty of a breach of a duty of public concern; and, within certain limitations,

the breach of this duty by a public officer is a crime, especially where the thing is of a ministerial or administrative nature, and the officer is intrusted with no discretion. Bishop, New Cr. Law, 267. The duty of the register in this case did not rest in discretion, but in obedience to plain provisions of law, easily understood and carried out. There could not be any reasonable pretext for holding back or refusing to pay over to the county treasurer the fees so received. Even if his predecessor in office did pursue the same course in retaining fees of the same kind, it did not justify the defendant in so doing. The fees charged, received, and used by the defendant were those for which he was authorized by law to charge. G. S. 1894, § 5567. They were received for making copies of public records in the office of the register of deeds. It is true, they were made for private parties, just as deeds, mortgages, and many other instruments are recorded for private individuals; but the fees received for making such copies are fixed by law, and the register cannot charge in excess of such amount, and, when received, the fees are just as much the money of the county as the fees received for recording such instruments. Such copies are made evidence to the same effect and extent as the originals. He receives such fees because he is a public officer, viz. register of deeds, not because he is contracting with a private individual in making such copies. He receives them in his official capacity, because he acts in that capacity in earning them, and all fees received by him are to be turned over to the county treasurer on the first Monday of each month. Under Sp. Laws 1891, c. 449, the fees of said office were to remain as they then were, but the register's salary was limited to $3,000. A public officer is entitled only to the salary or fees fixed by law. This is an inflexible rule.

The special law of 1891 just quoted provides that the number of deputies, clerks, and other employees in the office of the register of deeds of St. Louis county, and their compensation, shall at all times be under the control of the board of county commissioners of said county, which may make such changes in numbers and compensation from time to time as it may deem just and right. The fees which he receives and is required to pay over to the county treasurer may help to lessen the burden necessary to pay such compensation, but that is a matter over which the register has no control and no

right to interfere with. The defendant failed to pay over the fees received by him to the county treasurer, but kept them in addition to his salary, and claims to have paid them for clerk hire. He arrogated to himself the power of fixing the clerk's fees and the right to pay them out of fees received by himself, thus nullifying the express provisions of the law directing the officer to whom such fees should be paid. The law is not uncertain, indefinite, or obscure. If such a palpable violation of law can be perpetrated with impunity by one officer, others can do likewise, and the administration of justice will end in disorder and corruption.

It is true that the defendant testified to his honest belief that he had a right to the proceeds or fees for making such copies of the record in his office; that he made no concealment thereof; and that such fees were paid out for clerical work in his office. This right so to testify was not challenged or denied him, and the court repeatedly stated and so charged the jury that he might show himself innocent of any intent of wrongdoing or committing a public offense in appropriating these fees to his own use. And the question of criminal intent on the part of the defendant was left to the jury as a question of fact, and not ruled upon as a question of law by the court. The jury thus had before them the acts, conduct, and motives of the defendant in receiving the fees, and appropriating them to his own use. While it was competent for the defendant to testify as to his intent, the jury, upon the whole evidence, found against him.

3 Rice, Ev. § 285, reads as follows:

"The state is not expected and cannot be required, to make proof of felonious intent, as a fact, by direct and positive evidence; for, as a general rule, men who do or commit acts which the law denounces as public offenses do not proclaim in public places the intent with which such acts are done. If the state were required to make direct and positive proof of the felonious intent which characterizes the act done as a public offense, the result would be that many persons charged and guilty of public crimes would go acquitted, 'unwhipt of justice.' Therefore, all that the state is required to do in such cases is to introduce such evidence on the trial of the cause as will satisfy the triers of the facts, whether court or jury, beyond a reasonable doubt, not only that the act was done by the defendant, but that it was done with the felonious intent charged in the indictment. Padgett v. State, 103 Ind. 550."

The manifest purpose of the law upon this subject is plain, and the prohibition of the statute and punishment of its violation equally so. G. S. 1894, § 6663, makes it a felony for any public officer receiving money on behalf of or for account of the people of this state or any department of the government of this state to appropriate the same to his own use without authority of law. The jury by its verdict having found that the defendant's acts—forbidden by law—were intentionally done, and that the criminal intent combined with the criminal act constituted the public offense charged in the indictment, rendered its verdict accordingly, and hence upon this point it should not be disturbed.

In considering the objections to the instruction to the jury, it must be kept in mind that the commission of the act constituting the crime charged, and appropriating the money to his own personal use or to the payment of such employees as he saw fit, were admitted by him. These acts were in violation of law, and the only question remaining is the intent of the defendant; that is, whether he acted in good faith, supposing that he had a legal right under the statute to do what he did, or whether he did it with criminal intent.

The twentieth assignment of error relates to the charge of the court in instructing the jury that they should take into consideration the interest which the defendant, as a witness, may have in the result of this litigation. While the statute makes a defendant in a criminal case a competent witness in his own behalf, a juryman determining the weight to be given to his testimony has a right to take into consideration his interest in the result of the trial, the same as any other witness. When fairly construed in connection with other parts of the charge, this is all the point complained of amounts to.

Assignments of error 22 and 23 relate to the defendant's employing such help as he chose, and paying them fees, without in any manner making any accounts of such funds, and also in reference to the motive on the part of the defendant in altering Exhibit 101. The book Exhibit 101 had been used as evidence before the grand jury which indicted the defendant. He subsequently made certain alterations in the book. The court left it to the jury to determine whether he did this merely for his own convenience, or with the wrongful purpose and intention of deceiving, by changing the book

so as to make it have a different meaning than it apparently had before, and charged that, if they found that the latter was his intention, they would be warranted in disregarding any statement made by him, if they saw fit to do so.

While this is not as clearly or guardedly expressed as it might have been, this instruction was substantially correct. Where a defendant willfully manufactures false evidence in his own behalf or attempts to destroy evidence that would militate against him, on principle his conduct stands on the same footing as if he had willfully testified falsely in his own behalf, and the maxim, "False in one, false in all," should be equally applicable. The court did not withdraw defendant's testimony ordering the jury to disregard it, but left it to be considered by them in connection with the other evidence, with a prudential instruction to the effect that, if they found that defendant had willfully attempted to manufacture false evidence in his own behalf or to destroy evidence against himself, they were at liberty to disregard any statement made by him. We think this was correct, particularly in a case like this, where the vital question was whether the acts charged in the indictment were done with an honest or a corrupt intent.

As respects the twenty-fourth and twenty-fifth assignments of error, we think the court had a right to call the attention of the jury to the specific items of evidence bearing on the question of the defendant's intent, leaving it to the jury to determine what weight should be given to them. Taking the charge as a whole, the court clearly left it to the jury to determine the facts, and what weight should be given to any and all portions of the evidence.

Assignments of error 29 and 31 relate to defendant's requests, and, if given, would have been misleading, if not positively bad law, as applied to this case. If the commission of the act charged had been denied, and the state had attempted to prove it by circumstantial evidence, the requested instructions would have been appropriate. But in this case the commission of the act charged, which was a violation of the statute, was admitted, and the only question was as to the defendant's intent in committing it.

The question raised by assignment of error No. 30 relates to the refusal of the court to give defendant's requests as to reasonable

doubt. But the court, having given a correct and sufficient definition thereof, was not bound to give another differently expressed.

It is claimed that the sentence imposed was altogether disproportionate to the offense charged, and of which the defendant was convicted, and comes within the inhibition of Const. art. 1, § 5, that no cruel or unusual punishments be inflicted. This clause is found in the constitution of most of the states of the Union, and the right of this court to review a question of this kind is, we think, quite clear. We are not unmindful of the importance of this question, and have given to it that serious and thorough examination which such importance demands. The liberty of the defendant is at stake, and he should not be punished in a cruel or inhuman manner.

Punishment is a precaution against future offenses, and this is effected in three ways: (1) By the amendment of the offender himself; (2) by deterring others through his example; (3) by depriving the guilty party of the power to do future mischief. 4 Bl. Com. 11; Browne, Bl. Com. 668. Ordinarily, in this country, punishment for the commission of a public offense, aside from homicide, consists of a fine or imprisonment, or both. Under the civil law, as well as by the laws of France and some other nations, the rack was used to extort confessions from those charged with a criminal offense, "thus rating a man's virtue by the hardiness of his constitution, and his guilt by the sensibility of his nerves." In England there was a time when punishment was by torture, by loading him with weights to make him confess. Traitors were condemned to be drowned, disemboweled or burned. It was the law "that the offender shall be drawn, or rather dragged, to the gallows; he shall be hanged and cut down alive; his entrails shall be removed and burned while he yet lives; his head shall be decapitated; his body divided into four parts." Browne, Bl. Com. 617. For certain other offenses the offender was punished by cutting off the hands or ears, or boiling in oil, or putting in the pillory. By the Roman law a parricide was punished by being sewed up in a leather sack with a live dog, a cock, a viper and an ape, and cast into the sea.

These punishments may properly be termed cruel, but happily the more humane spirit of this nation does not permit such punishments to be inflicted upon criminals. Such punishments are not war-

ranted by the laws of nature or society, and we find that they are prohibited by our constitution.

But, within this limitation or restriction, the legislature is ordinarily the judge of the expediency of creating new crimes, and of prescribing the penalty.    G. S. 1894, § 6296, provides that

"A person convicted of a crime declared to be a felony, for which no other punishment is specially prescribed by this Code or by any other statutory provision in force at the time of the conviction and sentence, is punishable by imprisonment in the state prison or a county jail for not more than seven years or by a fine of not more than one thousand dollars or by both."

This is the legislative authority under which the defendant was sentenced.   The pecuniary punishment might have been twice as great, or imprisonment seven times as long, as that inflicted upon the defendant by the trial court.   The legislature fixed the extreme limits within which the court should impose the sentence, and decide whether the punishment should be light or great.   While the amount of money misappropriated in this instance was not great, the legislature evidently had in mind the fact that the misappropriation by a public official of the public money was destructive of the public rights and the stability of our government.   But fine and imprisonment are not ordinarily cruel and unusual punishments. Grand larceny in the second degree—that is, stealing money over $25 and less than $500 in amount—is punishable by a fine of not more than $500 or imprisonment in the county jail not exceeding one year.

As an excuse for his conduct in appropriating this money, the defendant testified that his predecessor had pursued the same course, and so informed him; said that he had taken advice from several attorneys and the attorney general, and that they had advised him that he had full right to pay the clerks himself, and that from another attorney he had received an opinion that the making out of papers could not be accounted official work, and that he thought that he had a right to retain the proceeds for making the copies.   This evidence, together with other evidence of a similar tendency, was submitted to the jury, upon the question of the defendant's intent; and the finding of the jury against the defendant

may have had its influence, resulting in a somewhat apparently severe sentence. Notwithstanding the testimony and evidence of the defendant as to his being free from any guilty intent, the jury did not believe him, because the verdict was based upon such intent as one of its essential and material elements. He intentionally committed the act constituting the crime, and the jury held him responsible criminally for the consequences of his act, although the legal effect proved to be different from that which he says he intended. That is his misfortune. The evidence fully warranted the findings of the jury, and, under the facts and the law, we cannot say that the sentence was cruel and unusual, or that there is anywhere manifest or reversible error in the record.

Order affirmed.

On November 23, 1897, the following opinion was filed:

PER CURIAM.

Since this opinion was filed our attention has been called by two of the judges of the district court for St. Louis county to some statements in the opinion, seemingly reflecting upon the conduct of the county attorney, which are not warranted by the actual facts. The judges state that the facts were that the county attorney never refused to act in the matter, but was at all times prepared to do his duty, but that the grand jury, being about to investigate the conduct of county officials, requested the court to grant them the assistance of a nonofficeholding attorney in making the investigation, and that the county attorney, in deference to this request, acquiesced in the appointment of such counsel. While this did not fully appear from the record, we have no reason to doubt that the judges' statement of the facts is correct. Such a course on the part of the county attorney would be suggested by a very natural feeling of delicacy, which would not at all reflect on his official conduct.